**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| JULIA VARVARO,<br><br>          Plaintiff,<br><br>v.<br><br>ROBERT BIANCHI,<br><br>          Defendant. | Case No. 1:26cv_____<br><br><br>**JURY TRIAL DEMANDED** |

**PRELIMINARY STATEMENT**

1.　"My relationship with Ms. Varvaro was brief and personal. **It was not a 'sugar' relationship nor do I allege she bilked me of anything**." This was the statement Defendant Robert Bianchi gave to *People Magazine*.[1]

2.　Mr. Bianchi's statement to *People Magazine* is true. But his statement is contradicted by a campaign of false statements that Mr. Bianchi, under the guise of anonymity, undertook to defame, hurt, and vilify Plaintiff Julia Varvaro ("Dr. Varvaro"), who at the time was the Deputy Assistant Secretary for Counterterrorism at the U.S. Department of Homeland Security.

3.　Why? Because while Mr. Bianchi wanted to get engaged, Dr. Varvaro thought it was too soon. And that rejection was too much for Mr. Bianchi. Instead of respecting Dr. Varvaro's position, he engaged in a campaign to defame Dr. Varvaro and label her a prostitute. But that label is not true.

4.　Dr. Varvaro and Mr. Bianchi met as most people do now—on a popular dating app called Hinge. From there, Dr. Varvaro and Mr. Bianchi went on dates, dinners, and vacations

---

[1] Rachel McRady, *DHS Official Under Investigation After Ex Alleges She Sought 'Sugar Daddies' and May 'Pose a Security Risk,'* PEOPLE, Apr. 24, 2026, available at https://people.com/dhs-official-under-investigation-sugar-daddy-claims-after-ex-reports-her-11957861 (Exhibit 1).

together. By all accounts, the relationship was flourishing. The two would cook meals together, Dr. Varvaro would drive through snow-covered roads to spend time with Mr. Bianchi, they visited his family in South Carolina and California, and she even brought him to the hospital, and laid out the money for it, when he fell ill during their vacation in Europe.

5.      That was not enough for Mr. Bianchi. Six weeks into their relationship, he was talking about engagement. But Dr. Varvaro did not want to get engaged yet.

6.      Recognizing this, Mr. Bianchi upped the pressure. In February 2026, Dr. Varvaro, a federal employee with the Department of Homeland Security, was furloughed. She prepared to take on outside work, such as bartending, to cover her expenses. Dr. Varvaro told Mr. Bianchi about her plan, but Mr. Bianchi insisted that she should come to him for funds instead of seeking outside work.

7.      When Dr. Varvaro tried to accept Mr. Bianchi's offer, Mr. Bianchi used it to pressure her into engagement—stating "I am not paying your bills until we are engaged."

8.      Dr. Varvaro refused and the parties ended their relationship. But Mr. Bianchi was not done.

9.      Mr. Bianchi decided to hurt and defame Dr. Varvaro. Mr. Bianchi has a lot of experience with the federal government, earning over $67 million in contracts as a federal contractor. His campaign was multi-pronged, based on experience, and designed to ensure that Dr. Varvaro's reputation would be damaged beyond repair.

10.     Mr. Bianchi first filed a complaint with the Department of Homeland Security's Office of Inspector General ("OIG"), in Washington, D.C., telling the OIG that Dr. Varvaro was a national security risk because she was conducting a "sugar daddy/prostitution" relationship with him. To bolster this falsity, Mr. Bianchi made knowing false statements in the OIG complaint,

stating that Dr. Varvaro "does not have college debt because sugar daddies paid for her college education" and the jewelry that Dr. Varvaro owned was "all trophies from her sugar daddies."

11.    Unsatisfied with just defaming her at work, Mr. Bianchi decided to make his lies public while maintaining his anonymity. Mr. Bianchi contacted Shawn Cohen, a reporter located in Washington, D.C., with the *Daily Mail*. Mr. Bianchi's plan was successful. The *Daily Mail* published a sensationalized story with the headline: "Secret 'sugar daddy' sex scandal explodes inside Trump's counterterrorism HQ: Read glamorous senior aide's voracious text messages, itemized 'trophies' . . . and her utterly shameless justification."[2] The story regurgitated Mr. Bianchi's OIG complaint, quoted from out-of-context text messages, claimed Dr. Varvaro had engaged Mr. Bianchi as her "sugar daddy," and exchanged sex for money.

12.    The *Daily Mail* article published Dr. Varvaro's name and her personal pictures with Mr. Bianchi. Yet, Mr. Bianchi's name was anonymized and his face blurred. This was a win-win for him.

13.    Mr. Bianchi was able to falsely label Dr. Varvaro as a prostitute, specifically one who has sex with older men in exchange for money, *i.e.*, a sugar-baby, while at the same time avoiding being identified as the man who had (allegedly) solicited prostitution or engaged in a sugar daddy relationship. While Mr. Bianchi was anonymous, it was easy to lie.

14.    But it was not long before Mr. Bianchi's name became public, too. Once his name surfaced, the same lie threatened to consume him: if the relationship was a "sugar daddy/prostitution" arrangement, then he was the man who had solicited it.

---

[2] Shawn Cohen, *Secret 'sugar daddy' sex scandal explodes inside Trump's counterterrorism HQ: Read glamorous senior aide's voracious text messages, itemized 'trophies' . . . and her utterly shameless justification*, DAILY MAIL, Apr. 22, 2026, available at https://archive.is/kYyJW (Exhibit 2).

15.     Thus, Mr. Bianchi was forced to reveal the truth. Despite accusing Dr. Varvaro of engaging in prostitution in the OIG complaint and later soliciting the *Daily Mail* to spread his lies, he recanted, revealing the truth for the first time only after the damage was already done.

16.     Specifically, once he had been outed, Mr. Bianchi admitted the truth to *People Magazine*, that the relationship was "brief and personal," that it was "not a 'sugar' relationship," and that he did not claim she had "bilked" him of anything.

17.     Unfortunately, Mr. Bianchi's later repudiation could not unring the bell. Once the *Daily Mail* story was published, Dr. Varvaro was immediately suspended from her Washington, D.C.-based position by the Department of Homeland Security. She was soon terminated, and the CIA, which had offered her employment as a targeting officer, rescinded its offer of employment. Various news and tabloid outlets republished the *Daily Mail* story, ensuring that this false story was viewed by millions of people around the world. Today, Mr. Bianchi's lies are the first results that appear when Dr. Varvaro's name is searched online.

18.     Dr. Varvaro built her reputation through years of hard work, including earning Master's and doctorate degrees from St. John's University and working as a graduate assistant, doctoral fellow, security analyst, program analyst, adjunct professor, and Deputy Assistant Secretary for Counterterrorism. Her reputation is ruined.

19.     Instead of being recognized for her accomplishments, Dr. Varvaro's reputation is now that of a "whore," a "professional escort," a "prostitute," and a "lady of the night."

20.     In short, Mr. Bianchi knew when he made the statements about Dr. Varvaro to the OIG and later to the *Daily Mail* that she was not a prostitute, was not seeking a sugar daddy relationship, and that their relationship was not a sugar daddy relationship. But Mr. Bianchi was a scorned lover, and he wanted revenge. He, therefore, set out to ruin Dr. Varvaro's hard-earned

reputation, hoping his reputation would not be harmed due to anonymity. When the cloak of anonymity lifted, he realized his lies would implicate his reputation too, and so he spoke the truth—Dr. Varvaro and he had a normal, albeit short, relationship. She did not date him because she was looking for a sugar daddy, she was not a prostitute exchanging money for sex, and she did not bilk him for his money.

21. Unfortunately for Dr. Varvaro, the truth came too late. Dr. Varvaro, therefore, seeks to hold Mr. Bianchi accountable.

## **PARTIES**

### A. *Plaintiff*

22. Plaintiff Julia Varvaro, Ph.D., lives in Arlington, VA.

23. She grew up in Long Island, New York, and from a young age devoted herself to keeping her country safe; a calling that stemmed from her father's experience on September 11, 2001. Her father, an NYPD officer, reported to Ground Zero in the aftermath of the attacks and joined the response and recovery effort, including the painful work of recovering the remains of those killed. Like so many first responders, he paid a lasting price: he breathed in the toxic dust that blanketed the site and developed serious, chronic health problems that persist to this day.

24. Though only a child on that day, Dr. Varvaro grew up living and looking up to her father's service, heroism, and sacrifice. She resolved to dedicate her own life to protecting the country from terrorism and preventing future attacks—pursuing the education and taking the jobs that would carry her toward a single goal: a career in counterterrorism and homeland security.

25. She graduated with a 4.0 in both her Master's and Ph.D. programs. Her education was paid partly by scholarships and partly by her parents, and she supported herself by working while continuing her education.

26.     Specifically, Dr. Varvaro held numerous prestigious jobs during her time in school, many of which prepared her for the career she was successfully pursuing: high-level government positions focused on preventing future terrorist attacks.

27.     She worked as a legal assistant at a law firm and later as a corporate security analyst at a bank. She also interned at the U.S. Secret Service, served as a graduate assistant for Homeland Security and Criminal Justice at St. John's University, researched cyber abuse as a doctoral fellow, and served as a program analyst with the Federal Emergency Management Agency under both the Biden and Trump Administrations.

28.     After she completed her education, Dr. Varvaro was hired to be an adjunct professor at St. John's University.

29.     In August 2023, she was hired by the Federal Emergency Management Agency as a Program Analyst.

30.     In February 2025, Dr. Varvaro was hired by the CIA to serve as a targeting officer in the Directorate of Operations.[3] She deferred her start date until June 29, 2026, so that she could first work for the Trump administration. As a targeting officer, Dr. Varvaro would have been responsible for, among other things, "find[ing] opportunities to disrupt terrorist attacks, illegal arms trade, drug networks, cyber threats, and counterintelligence threats." As part of the vetting for the CIA job, Dr. Varvaro completed and passed a full-scope polygraph examination, background check, and a drug screening.

31.     In May 2025, Dr. Varvaro was appointed Deputy Assistant Secretary for Counterterrorism. Her office was located, and her work was performed, in the District of Columbia.

---

[3] The Directorate of Operations is also referred to as the Clandestine Service.

32.     As Deputy Assistant Secretary for Counterterrorism, Dr. Varvaro held decision-making authority. Her work included developing policies for screening and vetting of visas and the United States' effort to combat human trafficking and cartels. As part of her job, she also presented to the United Nations Convention of Human Trafficking.

33.     Around April 22, 2026, after the *Daily Mail* published Mr. Bianchi's false accusations, Dr. Varvaro was put on administrative leave by the Department of Homeland Security.

34.     On May 5, 2026, the administration, compelled by the false and scandalous accusations, terminated her from her role as the Deputy Assistant Secretary for Counterterrorism.

35.     On May 13, 2026, the CIA rescinded her offer of employment.

## B.     *Defendant*

36.     Defendant Robert Bianchi is a resident of Maryland.

37.     Mr. Bianchi is the founder and Chief Executive Officer of SDVO Solutions, LLC, a Maryland federal contractor with active federal contracts. SDVO has received over $67 million in federal contracts since the beginning of 2015, nearly a third of which came in fiscal years 2025 and 2026. Mr. Bianchi is, by any measure, a wealthy and successful man, and he lives accordingly. He travels internationally for leisure, frequents high-end restaurants, takes ski vacations, and dresses in expensive clothes. This lifestyle is the context in which every aspect of his relationship with Dr. Varvaro unfolded, and the lens through which his later accusations against her must be understood.

38.     Mr. Bianchi's years in the federal-contracting world also made him a sophisticated player in government affairs. Through SDVO, he has held federal contracts since 2015 and has dealt for years with federal agencies. Mr. Bianchi understood how federal investigations and administrations work, what an OIG complaint is, how administrations avoid/extinguish public

scandal, and most important, what these accusations would do to Dr. Varvaro's reputation and career. He knew that accusing a sitting counterterrorism official of a "sugar daddy/prostitution" relationship and branding her a "security risk" would not merely embarrass her; it would imperil her clearance, her position, and her entire career.

39.     Mr. Bianchi also knew about Dr. Varvaro's lifelong desire to work in counterterrorism because she told him about her father's service and sacrifice at Ground Zero while they were dating. He wanted to hurt her where it would cause terrible pain, so he aimed his accusation at her career precisely because he knew how much it meant to her.

## JURISDICTION AND VENUE

40.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

41.     The parties are citizens of different States. Dr. Varvaro is a citizen of Virginia and Mr. Bianchi is a citizen of Maryland. The amount in controversy exceeds $75,000 exclusive of interest and costs.

42.     Mr. Bianchi is subject to this Court's personal jurisdiction because Mr. Bianchi's conduct was directed not only to Washington, D.C., but also to Virginia. During the couple's relationship, and after, Dr. Varvaro was a resident of Virginia. Mr. Bianchi and Dr. Varvaro frequently spent time at Dr. Varvaro's home in Virginia. Mr. Bianchi's defamatory statements were directed toward Dr. Varvaro in the District of Columbia, where she worked, and Virginia, where she lived, and the impact of his statements was felt by Dr. Varvaro in both locations as well.

43.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because substantial part of the events giving rise to the claim occurred in Virginia.

8

44.     District of Columbia law applies to Dr. Varvaro's claims because Mr. Bianchi's publications occurred in Washington, D.C., first to the OIG and then to Shawn Cohen, a reporter based there.

## FACTUAL ALLEGATIONS

### A.     *The Parties Meet on Hinge*

45.     Before Dr. Varvaro met Mr. Bianchi, she'd already built a successful career in counterterrorism. She had served in emergency-management roles at the Federal Emergency Management Agency under both the Biden and Trump Administrations. Most recently, she had been serving as the Deputy Assistant Secretary for Counterterrorism at the United States Department of Homeland Security and had accepted  an offer of employment from the CIA.

46.     In December 2025, Dr. Varvaro (29) matched with Mr. Bianchi (57) on Hinge, a platform singles use to find love and lifelong partners.

47.     Dr. Varvaro was not looking for a "sugar daddy" or any sort of *quid pro quo* relationship that exchanged money or similar benefits for sex. Instead, Dr. Varvaro sought an exclusive life partner, an individual who was accomplished, like her, mature, and caring. Mr. Bianchi seemed to fit the bill.

### B.     *The Relationship*

48.     From the beginning, Mr. Bianchi took the lead in their relationship and tried to impress Dr. Varvaro with unsolicited gestures and gifts. For example, for their first date, Mr. Bianchi picked—without any input from Dr. Varvaro—a nice restaurant and bar. Mr. Bianchi, at first appearing to always be the gentleman, only gave her two choices: pick her up, or Uber her:



49.    From there, Mr. Bianchi pursued Dr. Varvaro aggressively. Mr. Bianchi told Dr. Varvaro she was "elite" and, within days of meeting her, he invited her to his house in Maryland to see his Christmas decorations. He sent her articles about Camogli, a town on the Italian Riviera, and proposed they go to Italy together. He then shared images from his time in Italy to entice her to agree. Mr. Bianchi then began planning their first trip together. Dr. Varvaro, as anyone in a new relationship would, got excited about traveling, and began helping him plan the trip.

50.    Mr. Bianchi texted Dr. Varvaro good morning, asked her about her day, and took an interest in her work, her family, and the small things. When she awoke in pain, he wished for her to "get better." When she had a hard day at work, he proposed activities to cheer her up. Mr. Bianchi made Dr. Varvaro feel special.



51.    By late January, they were officially a couple.

52.    They traveled together, spent time at each other's homes, cooked, hung out with other couples, and did the ordinary things couples do. Dr. Varvaro drove through snowy roads to see Mr. Bianchi when she wanted to see him or when he wanted to see her; and Mr. Bianchi did the same. Mr. Bianchi even brought Dr. Varvaro on trips to meet his friends and his family.

53.    Mr. Bianchi, a wealthy and successful man, lived a high-flying lifestyle long before he met Dr. Varvaro—international travel, fine restaurants, ski trips, designer clothing. When Mr. Bianchi and Dr. Varvaro became a couple, he wanted her to be part of his life, and he incorporated her into the lifestyle he already led. Mr. Bianchi, on his own initiative, planned the trips, chose the restaurants, and bought Dr. Varvaro gifts. Dr. Varvaro never asked him to do any of it, much less make it a condition of the relationship.

54.    The relationship typified a couple falling in love.

55.    Indeed, just six weeks into the relationship, Mr. Bianchi raised the prospect of getting engaged. He said: "I'm not putting a ring on it till summer in Camogli." While Dr. Varvaro had feelings for Mr. Bianchi and was enjoying the relationship, this was a bit too fast for her. She gently pushed back, saying: "Maybe not even that soon."



56.    In February, Mr. Bianchi told Dr. Varvaro that he loved being with her.

57.    On February 25, 2026, Mr. Bianchi upped the ante. He told Dr. Varvaro: "I love you. Will say it loudly every day." Dr. Varvaro also found herself falling in love with Mr. Bianchi, his caring nature, and the attention he was giving her. She said it back: "Love you too."



58.     The couple shared jokes and pet names, calling each other "lover." Indeed, while aware of the age difference, the couple turned it into something playful and fun. Mr. Bianchi called himself "Daddy" when teasing Dr. Varvaro: "Don't fuck with Daddy on fashion." Dr. Varvaro playfully replied, "Daddy knows all." It was the texture of an ordinary romance between two adults.



59.     This was not a transactional or "sugar daddy" relationship, and Mr. Bianchi knew it. Indeed, their correspondence shows that the two were in a loving and committed relationship where they truly cared about each other.

60.     The depth of the parties' commitment to one another was evident in how they cared for each other in difficult moments.

61. On February 16, 2026, Mr. Bianchi began experiencing extreme pain during their European trip, later discovered to be kidney stones. Like any devoted partner, Dr. Varvaro dropped what they were doing, took Mr. Bianchi to an urgent care center, and remained attentive through his treatment. Mr. Bianchi, frightened and in pain, leaned on his girlfriend the way partners lean on one another, writing: "I'm sorry lover. Obviously never had this happen before. Thanks for your help today. I was struggling. Will [l]et you know when I hear something."

62. Dr. Varvaro's concern was for Mr. Bianchi, not for logistics: "It's okay lover as long as you are good is the only thing that matters." When Mr. Bianchi worried he might need to stay overnight at the hospital, she reassured him, "Whatever you need I will figure out as long as you're good."



63. Mr. Bianchi, moved by her care, told her, "I love you Julia. Thanks for being You," and Dr. Varvaro answered, "I love you too." These exchanges and the parties' conduct are

13

inconsistent with a transactional relationship. These are not the conversations of a "John" with his prostitute. They were the words of two people in love. Nor are they the words of a "sugar baby" relationship. Indeed, Dr. Varvaro, without hesitation, had even laid out $1,100 for Mr. Bianchi's medical treatment.



Ok stay relaxed, I will be there tomorrow afternoon

No worry about me

Baby will figure it out

Make daddy whole again for me

I love you Julia. Thanks for being you

I love you too

You'll be good I will see you in the morning

64.    Dr. Varvaro's care went well beyond emotional or financial support. She took charge of Mr. Bianchi's treatment: she communicated directly with the medical providers, explained his symptoms, conditions, and medical history to them, and completed the necessary intake and treatment paperwork on his behalf. Frightened and far from home, Mr. Bianchi relied heavily on Dr. Varvaro's assistance and advocacy.

65.    Dr. Varvaro was a partner, not a sugar baby prostitute. She did what a devoted partner would do while her boyfriend was in the hospital in a foreign country. She packed their six pieces of luggage, checked out of their hotel, loaded their things into a car, drove 40 minutes through treacherous, snowstorm-stricken mountain roads to the hospital, and picked Mr. Bianchi up.

14



66.    Their relationship grew even stronger after that trip. After Dr. Varvaro told Mr. Bianchi she loved him, he said "I'm yours lover" and then gave Dr. Varvaro the combination to his home and told her "you are always welcome any time or day."



67.    They regularly exchanged "I love you" messages, hung out at each other's homes, told each other how they missed each other when they were apart, and encouraged each other's success. For example, Mr. Bianchi told Dr. Varvaro that "I'm proud of the work you do. You're making a difference."



68.     Dr. Varvaro did not hesitate to be vulnerable with Mr. Bianchi because he made her feel safe. For example, when Dr. Varvaro was feeling insecure about her appearance or having a rough day at work, she shared that with Mr. Bianchi. He, in turn, supported her in these moments, stating "I think you're awesome" and "I love how you are. A curve or two in the perfect spots."



69.     It was not just their words that showed this was a bona fide relationship, but their actions as well.

70.     Mr. Bianchi, like any rational parent, would not introduce his children to a prostitute or a "sugar baby." Mr. Bianchi, like any rational parent, would not bring a woman he is paying for sex to meet his family, sit across from them at dinner, and begin building relationships with them.

71.     Yet, that is exactly what Mr. Bianchi did – because, of course, Dr. Varvaro was his girlfriend and not a woman he paid to have sex with.

72. Specifically, over the course of multiple weeks, Dr. Varvaro took time off work and traveled to meet each of Mr. Bianchi's three children because he wanted to foster a relationship between his children and Dr. Varvaro. She first flew to San Diego to meet one of Mr. Bianchi's daughters, with whom she attended early-morning yoga class. She met Mr. Bianchi's son and his girlfriend over dinner in Washington, D.C. And in Charleston, she met his second daughter, where Mr. Bianchi only half-jokingly introduced Dr. Varvaro as his daughter's "stepmother."

 



73. This was a momentous occasion in the relationship. Neither Mr. Bianchi nor Dr. Varvaro were blind to the societal stigma of a younger woman dating an older man. And while Mr. Bianchi later used this stigma to label Dr. Varvaro a sugar baby and prostitute when he

couldn't have his way, the contemporaneous messages show that Dr. Varvaro met with Mr. Bianchi's children to try and start a relationship with them.

74.   After Dr. Varvaro met Mr. Bianchi's children, he texted her, "Thanks for a nice evening. I appreciate you meeting all my kids and starting a relationship with them—it means a lot to me. You mean a lot to me. I love you" and Dr. Varvaro responded, "[a]nd I appreciate your openness and wanting me to meet them, they are all lovely."

> Thanks for a nice evening. I appreciate you meeting all my kids and starting a relationship with them—it means a lot to me. You mean a lot to me. I love you. 😘
>
> And I appreciate your openness and wanting me to meet them, they are all lovely 😘

75.   To be sure, like every other relationship, the couple fought. But these issues underscore that the relationship was a typical romantic partnership and not a "sugar daddy" relationship. Indeed, Dr. Varvaro did not hesitate to stand up for herself or tell Mr. Bianchi off when he hurt her, on one occasion telling him "[i]f you want to apologize or talk and come over tomorrow night, let me know. Otherwise don't ever talk to me again."

76.   A sugar baby does not tell her sugar daddy "don't ever talk to me again" or demand an apology; she can't afford to – the whole arrangement depends on keeping him happy. Yet, Dr. Varvaro threatened to walk away over *feeling disrespected*. Dr. Varvaro valued the relationship for the relationship, not the money.

77.   That said, disagreements between the couple were few. The relationship was, by all accounts, in its honeymoon phase, during which the couple shared intimate and flirty messages, went out for dinner, spent time together, took trips, and, like a traditional gentleman, Mr. Bianchi paid for dates and gave gifts.

18

78.     For example, after Mr. Bianchi was released from the hospital during their visit to Europe, the couple went shopping. While shopping, Dr. Varvaro decided to buy a purse from Bottega Veneta. She tendered her own card. Mr. Bianchi, however, insisted on paying himself: he had the store take his credit card, instead of Dr. Varvaro's.

79.     The Mr. Bianchi of those first months—the caring, generous, playful, and family-introducing boyfriend—was the person with whom Dr. Varvaro had agreed to be in a relationship.

### C.    *The Government Shutdown*

80.     While the parties' relationship was developing, Dr. Varvaro's life was disrupted by a government shutdown. In mid-February, the Department of Homeland Security entered an extended federal funding lapse, the start of what would become the longest partial shutdown in American history, lasting seventy-six days. Dr. Varvaro, like other DHS employees, was furloughed without pay. Her rent and other expenses continued. Her federal salary did not.

81.     On March 1, 2026, after learning about Dr. Varvaro's furlough, Mr. Bianchi continued to be generous. He sent Dr. Varvaro "half [of her] rent due to furlough." Dr. Varvaro did not ask for rent, nor did she condition companionship based on it. Instead, Mr. Bianchi, on his own initiative, sent her the money because he knew she (like thousands of other civil servants) was struggling, he had the funds, he loved her, and wanted to take care of her.

82.     The shutdown continued through March. As April approached, with no end in sight, Dr. Varvaro planned to take on outside work, including bartending, to cover her expenses. During their conversations, Dr. Varvaro shared her plan with Mr. Bianchi.

83.     Consistent with his apparently caring nature, Mr. Bianchi told Dr. Varvaro not to bartend. Instead, Mr. Bianchi told Dr. Varvaro to come to him for the money instead.

84.     Dr. Varvaro—who had been in a relationship with Mr. Bianchi for three months by then, who had been told by Mr. Bianchi he loved her almost every day for the past few months,

and who had been introduced to Mr. Bianchi's children so she could build a relationship with them—accepted his offer. But Mr. Bianchi had other plans.

### D.    *The Other Mr. Bianchi*

85.    With April rent due and the shutdown ongoing, Dr. Varvaro followed her boyfriend's advice. She skipped the bartending job and came to him for help. Mr. Bianchi did not say no. Instead, he used this opportunity as a means of control.

86.    Mr. Bianchi told Dr. Varvaro that "I told you I am not paying your bills until we are engaged."

87.    The man who had said he loved her almost daily, who introduced her to all his children, who gave her unsolicited gifts, who lulled her into not working, was suddenly transactional. The attentive Mr. Bianchi of January and February was gone. In his place was a Mr. Bianchi who treated Dr. Varvaro's service to her country and resulting predicament, something he told her he was "proud" of, as leverage to extract a marriage commitment.

88.    Dr. Varvaro refused. She told him she did not need an ATM and was not looking for a transactional relationship. She wanted a caring and protective boyfriend. And Mr. Bianchi clearly wasn't that. Dr. Varvaro decided to end the relationship because it was clear that Mr. Bianchi sought control, not love, and that his previous actions, while seemingly generous, were simply manipulation.

89.    Suddenly Mr. Bianchi found himself enraged instead of engaged; hurt, he decided to make Dr. Varvaro hurt too. And so he cooked up a scheme to falsely accuse Dr. Varvaro of being a "sugar baby," a prostitute, who traded sex for gifts.

90.    More specifically, the lie was that Dr. Varvaro pursued and engaged in a "sugar daddy/prostitution" relationship with him – that is, Dr. Varvaro exchanged sexual favors in return

for money and/or gifts from Mr. Bianchi. He bootstrapped this lie into a second one: that she was a "security risk" to the United States.

91.     Mr. Bianchi understood the obvious sensitivities associated with national security roles in the federal government, having derived his wealth from federal contracting. He also knew that Dr. Varvaro's counterterrorism career was not merely a job, but her life's calling. Mr. Bianchi plotted an assault that would simultaneously strike Dr. Varvaro where she was the most invested— her national security career, and where she was most vulnerable—her gender.

**E.     *Mr. Bianchi, for revenge, mounted a false attack on Dr. Varvaro's reputation through multiple channels, both inside and outside the federal government***

### 1)  The OIG Complaint

92.     On or around April 5, Mr. Bianchi submitted a written complaint to the OIG of the Department of Homeland Security in Washington, D.C. In the OIG complaint, he falsely claimed that Dr. Varvaro:

    a.  Was conducting a "sugar daddy/prostitution" relationship with him, stating "I did not want a sugar daddy/prostitution relationship, after spending $30,000-$40,000 for vacations, Cartier jewelry, expensive handbags, and various shopping trips";

    b.  Had her education paid for by "sugar daddies," stating that Dr. Varvaro told him that she "does not have college debt because sugar daddies paid for her college education";

    c.  Told him that the jewelry on her "wrists and ears [were] all trophies from her sugar daddies."

93.     These accusations are false.

94.     As described above, Dr. Varvaro's relationship with Mr. Bianchi was a normal, romantic, age-gap relationship grounded in a desire to find a life partner. Dr. Varvaro did not

engage in a transactional relationship, did not sell herself, or her affection for money, did not engage in sex work, and never intended to have that relationship with Mr. Bianchi. Moreover, her education was paid by scholarships, work, and her parents, not romantic partners. And the referenced jewelry consisted of Christmas and birthday gifts from a former boyfriend with whom she had been in a two-year relationship.

### 2) *The Daily Mail interview*

95.    Mr. Bianchi did not stop with the OIG complaint. He was out to inflict maximum damage. He needed to humiliate Dr. Varvaro publicly the way he felt humiliated privately after the relationship ended. So he took his OIG complaint and defamatory accusations to the press.

96.    Mr. Bianchi got in touch with Shawn Cohen, a reporter at the *Daily Mail* based in Washington, D.C.

97.    Mr. Bianchi supplied the *Daily Mail* with the OIG complaint, selected photographs of Dr. Varvaro, and screenshots of carefully curated text messages intended to make it look like Dr. Varvaro was engaged in a "sugar daddy/prostitution" relationship.

98.    Mr. Bianchi essentially asked the Daily Mail to ruin Dr. Varvaro's life but demanded they keep his own identity a secret. He supplied Dr. Varvaro's name but withheld his own. He supplied pictures of Dr. Varvaro but blurred his face. That is presumably because it is both illegal and humiliating to be outed a "John" who procures sex with money.

99.    The *Daily Mail* published Mr. Bianchi's lies on April 22, 2026. The article appeared under the headline: "*Secret 'sugar daddy' sex scandal explodes inside Trump's counterterrorism HQ: Read glamorous senior aide's voracious text messages, itemized 'trophies' . . . and her utterly shameless justification.*" The article repeated Mr. Bianchi's OIG lies, reproduced Mr. Bianchi's photographs and screenshots, and attributed Mr. Bianchi's direct quotations to a "Robert."

22

**m+ EXCLUSIVE Secret 'sugar daddy' sex scandal explodes inside Trump's counterterrorism HQ: Read glamorous senior aide's voracious text messages, itemized 'trophies'… and her utterly shameless justification**

- Politics is fast. We're faster. Sign up to the DC Insider newsletter for a front-row seat to Washington… and unlock 3 FREE months of DailyMail+ **HERE**

By SHAWN COHEN, US SENIOR REPORTER
PUBLISHED: 09:09 EDT, 22 April 2026 | UPDATED: 08:25 EDT, 23 April 2026




100.    The *Daily Mail* also published the article under the headline: *"Maga Money Honey—'Sugar daddy' sex scandal erupts at Trump's counterterrorism HQ: Read senior aide's voracious texts."*[4]

---

[4] Erkki Forster, *Top Trump Terror Official's Sugar Daddy, 57, Unmasked*, YAHOO! NEWS, Apr. 23, 2026, available at https://www.yahoo.com/news/articles/top-trump-terror-official-sugar-223150778.html.



101.    That same night, the Department of Homeland Security placed Dr. Varvaro on administrative leave.

102.    Dr. Varvaro was terminated from her position on May 5, 2026.

**F.    *Mr. Bianchi's anonymity ends and he finally speaks the truth***

103.    On April 23, 2026, the New York Post identified the "ex-boyfriend" as Mr. Bianchi. The *New York Post* reported his identity, his age, his role as Chief Executive Officer of SDVO Solutions, LLC, and the more than $67 million in federal contracts SDVO Solutions had received since 2015.[5]

104.    *People Magazine* confirmed Mr. Bianchi's identity around the same time and contacted him for comment.

---

[5] Jacqueline Sweet, *Glam DHS official's ex, who claims she used him as a $40,000 'sugar daddy,' is IT exec with $67M in government contracts*, NEW YORK POST, Apr. 23, 2026, available at https://nypost.com/2026/04/23/us-news/sugar-daddy-ex-of-glam-dhs-official-ided-as-government-contractor-robert-bianchi/ (Exhibit 3).

105.    Confronted by People Magazine with his identity exposed, Mr. Bianchi recanted everything. To People, he gave the following statement, suddenly repudiating the lies he told the OIG and to the *Daily Mail*:

> "My relationship with Ms. Varvaro was brief and personal. **It was not a 'sugar' relationship nor do I allege she bilked me of anything. I ended the relationship, amicably."**

106.    Mr. Bianchi recanted because the lie, once attached to his name, exposed him to a similar reputational injury he had set out to inflict on Dr. Varvaro. If the parties' relationship was a "sugar daddy/prostitution" arrangement, as Mr. Bianchi had told the OIG and the press, then he was the man who had solicited prostitution and was, by his own characterization, a sugar daddy John.

## G.    *Republication and resulting public attention*

107.    Mr. Bianchi's lies were republished by, among others, the *New York Post*, the *Inside Edition*, the *Daily Beast*, Fox News, TMZ, Russian State Media (RT), Indian Media, IBTimes UK, Middle East Eye, MSN, and many other outlets. Mr. Bianchi's lies reached an audience of many millions and on every social media platform. Mr. Bianchi's lies remain, even today, among the first results returned when Dr. Varvaro's name is searched online. Dr. Varvaro's Wikipedia entry also references the allegations.

108.    Dr. Varvaro's reputation—built over years of hard work—is destroyed. Today, instead of being recognized for her accomplishments and government service, Dr. Varvaro is referred to as a "whore," a "professional escort," a "prostitute," and a "lady of the night."

## H.    *Mr. Bianchi always knew the truth*

109.    Mr. Bianchi knowingly made these false statements to ensure Dr. Varvaro would suffer.

25

110.    Mr. Bianchi knew that his relationship with Dr. Varvaro was not transactional, *i.e.*, Dr. Varvaro was not a prostitute exchanging money for sex; nor was Mr. Bianchi a sugar daddy that paid Dr. Varvaro in exchange for sex or companionship.

111.    The couple's contemporaneous conduct made clear that Mr. Bianchi knew the true nature of their relationship. He told Dr. Varvaro he loved her almost daily, and she reciprocated. The couple cooked together, drove to each other's homes, and told each other they missed one another. Most tellingly, he even introduced Dr. Varvaro to his children so that she could develop relationships with them. None of this is consistent with the "sugar daddy/prostitution" framing Mr. Bianchi lied about to the OIG and the press.

112.    In fact, Mr. Bianchi's statement to *People* makes clear that he knew all along that Dr. Varvaro was not engaging in prostitution or in a "sugar" relationship with him. Nonetheless, he told both the OIG and the *Daily Mail* that Dr. Varvaro was just that. Mr. Bianchi recanting to *People* proves that he was subjectively aware and had actual knowledge that his statements to the OIG and *Daily Mail* were false. Liars know they're lying.

113.    Mr. Bianchi also knew that Dr. Varvaro did not tell him that sugar daddies paid for her college education or that the jewelry she owned were trophies from her sugar daddies. Dr. Varvaro never said either of these things because they are false.

### I.    *Damages*

114.    Dr. Varvaro has lost her position at the Department of Homeland Security and her job at the CIA. She has lost the salary, benefits, and federal retirement contributions those positions carried. She has lost the career trajectory associated with senior federal counterterrorism service and her senior executive status.

115.    Dr. Varvaro has also lost the ability to obtain comparable employment in the public sector, the private national-security sector, and academia. The fields in which Dr. Varvaro trained,

completed her doctorate, and built her early career, are fields in which Mr. Bianchi's lies are categorically disqualifying.

116.    Dr. Varvaro's name will, for the duration of her professional life, be synonymous with Mr. Bianchi's lies. Today, when someone searches for her name online, they will associate her with Mr. Bianchi's lies. Indeed, anyone who walks the streets of D.C. continues to see Dr. Varvaro's name associated with Mr. Bianchi's lies:



*(Photograph of life-sized poster of Daily Mail article
encountered by counsel on a recent trip to Washington, D.C.)*

117.    Dr. Varvaro has suffered, and continues to suffer, severe emotional distress, humiliation, and harassment as a result of the global media coverage Mr. Bianchi set in motion. Here is an example of what Dr. Varvaro's social media inboxes now look like:



118.    The harm has been medical as well as reputational and professional. Dr. Varvaro has been prescribed new and additional anti-anxiety and antidepressant medication that leaves her feeling numb, and she has suffered stress-induced vision impairment. She regularly visits a therapist to help her with the pain and suffering from Mr. Bianchi's lies.

119.    Dr. Varvaro's scholarship included a focus on protecting women from sexual exploitation and technology-facilitated sexual abuse. Mr. Bianchi made her a victim of precisely that: he weaponized her gender and her private life, fed her photographs and intimate messages to a reporter, and engineered her sexual humiliation before a global audience. The woman devoted to protecting such victims became a victim herself.

## CLAIMS FOR RELIEF
## COUNT I — DEFAMATION PER SE

120.    Dr. Varvaro incorporates paragraphs 1 through 119 by reference.

121.    Mr. Bianchi made, published, and then caused to be republished false statements of and concerning Dr. Varvaro.

122.    In his OIG complaint, Mr. Bianchi falsely stated, in sum and substance, that:

a.   Dr. Varvaro conducted a sugar daddy/prostitution relationship with Mr. Bianchi;

b.   Dr. Varvaro told Mr. Bianchi that sugar daddies paid for her college education;

c.   Dr. Varvaro told Mr. Bianchi that the jewelry she owned consisted of trophies from sugar daddies; and

d.   Dr. Varvaro was a national security risk as a result of her willingness to engage in sugar daddy/prostitution.

123.    Mr. Bianchi, through his communications with the *Daily Mail*, caused these false statements to be republished by the press for a global audience.

124.    These statements were false.

125.    Mr. Bianchi's false statements constitute defamation per se. The statements impute to Dr. Varvaro the commission of a crime, namely prostitution, and prejudice her in her chosen profession. The statements also impute serious sexual misconduct and tend to subject Dr. Varvaro to hatred, distrust, ridicule, contempt, and disgrace, including in her chosen profession.

126.    By submitting the false statements to a federal inspector general's office, supplying them to the *Daily Mail*, providing on-the-record statements to the *Daily Mail* for republication, and supplying photographs and documentary materials calibrated to maximize the reach and impact of his accusations, Mr. Bianchi knew or should have known that the false statements would be republished over and over by third parties to Dr. Varvaro's detriment.

29

127.    Republication by *The New York Post*, *People Magazine*, *The Daily Beast*, Fox News, Inside Edition, TMZ, RT, IBTimes UK, Middle East Eye, and other media outlets, and by users of Twitter (X), Facebook, Instagram, TikTok, and other social-media platforms, was the natural and probable consequence of Mr. Bianchi's actions and was actually and/or presumptively authorized by Mr. Bianchi. In addition to his original publications, Mr. Bianchi is liable for the republications of the false and defamatory statements by third parties under the republication rule.

128.    As a direct result of Mr. Bianchi's defamation, Dr. Varvaro suffered presumed damages and actual injury, including but not limited to insult, pain, embarrassment, humiliation, emotional suffering, injury to her reputation, injury to her eyesight, loss of her federal positions, loss of future earnings, diminished earning capacity, and costs and other out-of-pocket expenses, in a sum to be determined by the jury.

129.    Mr. Bianchi published the false and defamatory statements purposely, recklessly, and with subjective knowledge that the statements were false. Mr. Bianchi published the false statements about Dr. Varvaro without reasonable care as to the truth or falsity of those statements. Mr. Bianchi published the false and defamatory statements with a specific intent to harm Dr. Varvaro. He has both actual and express malice:

    a.   Mr. Bianchi knew that his relationship with Dr. Varvaro was not transactional, *i.e.*, Dr. Varvaro was not a prostitute exchanging money for sex; nor was Mr. Bianchi a sugar daddy that paid Dr. Varvaro in exchange for sex or companionship.

    b.   Mr. Bianchi's recantation to *People Magazine*, given the day after Mr. Bianchi was identified by name, demonstrates the statements he supplied to the OIG and the press were not, in his subjective view, the truth.

c. Mr. Bianchi also knew that Dr. Varvaro did not tell him that sugar daddies paid for her college education or that the jewelry she owned were trophies from her sugar daddies. Dr. Varvaro never said either of these things because they are false.

d. Because Mr. Bianchi knew these things were false, he also knew that his accusation that Dr. Varvaro posed a security risk to the United States, as a result of those lies, was false.

e. Mr. Bianchi constructed and executed his accusation out of a desire to hurt Dr. Varvaro, to ensure her career and reputation suffered, and to permanently stigmatize her.

## COUNT II — DEFAMATION BY IMPLICATION

130. Dr. Varvaro incorporates paragraphs 1 through 129 by reference.

131. The strong defamatory gist and false implication of Mr. Bianchi's publications alleged herein, including true statements presented in a prejudicial light, is that Dr. Varvaro was engaged in prostitution or a transactional relationship exchanging sex for gifts with older men.

132. Mr. Bianchi chose his words to maximum effect and purposefully juxtaposed a series of facts, including their age gap, private pictures, and curated out-of-context text messages so as to imply a defamatory connection between them.

133. Mr. Bianchi created defamatory implications by combining the following factually true propositions, which, when read in the context Mr. Bianchi presented them—including Mr. Bianchi's "sugar daddy/prostitution" framing and the fabricated quotations attributed to Dr. Varvaro—created the false impression that Dr. Varvaro was engaged in prostitution:

a. that the parties exchanged affectionate text messages using the pet name "Daddy." That statement is true. But in the context Mr. Bianchi supplied to the *Daily Mail*, accompanied by his "sugar daddy/prostitution" framing, the texts were presented

31

as confirmation that the relationship was transactional sex work — when in reality, this was just a couple trying to make light of their age difference by calling each other pet names;

b. that Mr. Bianchi made Apple Cash transfers to Dr. Varvaro during the relationship. That statement is true. But in the context Mr. Bianchi supplied to the *Daily Mail*, accompanied by his "sugar daddy/prostitution" framing, the transfers were presented as consideration for sex—when, in reality, the transfers were the financial exchanges of a romantic relationship, including a partial rent contribution during a federal-government shutdown, made on Mr. Bianchi's own initiative;

c. that the parties had a substantial age difference. That statement is true. But in the context Mr. Bianchi supplied to the *Daily Mail*, accompanied by his "sugar daddy/prostitution" framing, the age difference was presented as confirmation of the transactional nature of the relationship — when in reality, age-asymmetric romantic relationships do not become "sugar daddy/prostitution" arrangements by virtue of their age difference alone;

d. That Mr. Bianchi bought her a handbag in Milan for $3,500. That statement is true. But Mr. Bianchi left out the fact that Dr. Varvaro elected to buy it for herself, tendered her own credit card for the bag, and that after, Mr. Bianchi then insisted on paying. The selective disclosure, along with the "sugar daddy/prostitution" framing was presented as confirmation of the transactional nature of the relationship;

e. That the couple took trips together to Aruba and Europe. That statement is true. But in the context Mr. Bianchi supplied to the *Daily Mail*, accompanied by his "sugar

daddy/prostitution" framing, the trips were presented as lavish gifts purchased in exchange for sex—when, in reality, Mr. Bianchi is a wealthy man who routinely travels internationally and took these trips with Dr. Varvaro on his own initiative and because she was his girlfriend, and wanted her there with him. Dr. Varvaro never demanded the trips, never conditioned the relationship on them, and would have been just as happy without them. Couples in committed relationships travel together, and nothing about these trips distinguished them from the vacations of any other couple in which one partner has the means to pay.

134.    Mr. Bianchi's defamatory publications convinced members of the public that Dr. Varvaro was a prostitute and/or was engaging in improper sexual behavior as a "sugar baby."

135.    Without any factual basis, but influenced by Mr. Bianchi's accusations and the global press coverage they generated, members of the public have republished Mr. Bianchi's accusations across multiple social-media platforms and begun to harass and solicit Dr. Varvaro for sex.

136.    As a direct result of Mr. Bianchi's defamation by implication, Dr. Varvaro suffered damages and actual injury, including but not limited to insult, pain, embarrassment, humiliation, emotional suffering, injury to her reputation, injury to her eyesight, loss of her federal positions, loss of future earnings, diminished earning capacity, and costs and other out-of-pocket expenses, in an amount to be determined by the Jury.

137.    Mr. Bianchi published the false statements and the false implications intentionally, deliberately, and with actual and express malice as set forth in Count I above.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment against Defendant for presumed

33

damages; actual damages, including lost profits and lost business opportunities; mental anguish, distress, and humiliation; punitive damages; costs of bringing this action; pre- and post-judgment interest; and such additional relief as this Court deems appropriate.

Dated: July 20, 2026

Respectfully Submitted,

/s/ *Karen Kelly*
Karen E. Kelly, Esq.
Local Counsel
Virginia State Bar:  35403
**Kostelanetz LLP**
601 New Jersey Ave., Suite 260
Washington, DC 20001
Tel:  (202) 800-6397
Facsimile: (202) 844-3500
Email: KKelly@Kostelanetz.com

**FREEDMAN NORMAND FRIEDLAND LLP**
Devin (Velvel) Freedman (*pro hac vice* forthcoming)
Florida State Bar: 99762
Niraj Thakker (*pro hac vice* forthcoming)
Florida State Bar: 1040169
1815 Purdy Ave.,
Miami Beach, Florida 33139
Tel: (786) 924-2900
Fax: (646) 392-8842
Emails: vel@fnf.law
         nthakker@fnf.law

Joseph M. Delich (*pro hac vice* forthcoming)
New York State Bar: 5487186
10 Grand Central
155 E. 44th Street, Suite 915
New York, New York 10017
Tel: (646) 970-7541
Fax: (646) 392-8842
Email: jdelich@fnf.law

*Counsel for Plaintiff*

34